IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| RICHARD RAYMOND GRAYS, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Civil Action No. 3:12-CV-00138-B (BH) |
| | § | |
| CAROLYN W. COLVIN, ACTING | § | |
| COMMISSIONER OF THE SOCIAL | § | |
| SECURITY ADMINISTRATION, | § | |
| | § | |
| Defendant. | § | |

## MEMORANDUM OPINION AND ORDER

Before the Court are Plaintiff's Motion for Summary Judgment, filed August 10, 2012 (doc. 11), and Defendant's Motion for Summary Judgment, filed October 9, 2012 (doc. 15). Based on the relevant filings, evidence, and applicable law, Plaintiff's motion is **GRANTED in part**, Defendant's motion is **DENIED in part**, and the case is **REMANDED** to the Commissioner for further proceedings consistent with this Memorandum Opinion and Order.

## I.

## BACKGROUND[1]

A.    *Procedural History*

Plaintiff Richard Raymond Grays seeks judicial review of a final decision by the Commissioner of Social Security ("Commissioner") denying his claim for supplemental security income under Title XVI of the Social Security Act. (R. at 11–19.) On May 29, 2009, Plaintiff applied for supplemental

---

[1]  The background information comes from the transcript of the administrative proceedings, which is designated as "R."

-1-

security income, alleging disability beginning on April 1, 2009, due to degenerative disc disease and bipolar disorder. (R. at 27, 123.) His application was denied initially and upon reconsideration. (R. at 48–54, 63–65.) He timely requested a hearing before an Administrative Law Judge ("ALJ"). (R. at 11.) He personally appeared and testified at a hearing held on May 3, 2010. (R. at 25–47.) On August 19, 2010, the ALJ issued her decision finding Plaintiff not disabled. (R. at 11–19.) He requested review of the ALJ's decision, and the Appeals Council denied his request on November 14, 2011, making the ALJ's decision the final decision of the Commissioner. (R. at 1–3.) He timely appealed the Commissioner's decision pursuant to 42 U.S.C. § 405(g). (doc. 11.)

B.    *Factual History*

      1.     Age, Education, and Work Experience

Plaintiff was born on November 7, 1959. (R. at 11, 51.) At the time of the hearing before the ALJ, he was 50 years old. (R. at 28.) He completed the 11th grade and has past relevant work as a kitchen helper. (R. at 41, 66.)

      2.     Medical Evidence[2]

On June 22, 2009, Plaintiff presented to the emergency room at Baylor University Medical Center ("Baylor") complaining of pain, weakness, numbness, and tingling starting from his neck and radiating into his right arm down to his right fingers. (R. at 180.) He told Allison Lander, M.D., the examining physician, that his symptoms had been on-going for more than two months. (*Id.*) He also stated that he had been experiencing shortness of breath and a sharp "pain in the anterior [of his] chest" for the past week. (*Id.*) Dr. Lander recorded his "past" medical "history" as "bipolar disorder,

---

    [2] Because this action is ultimately resolved based on a physical impairment, a recitation of the psychological and psychiatric evidence is unnecessary.

allergic rhinitis, [and] umbilical hernia repair." (R. at 182.) She noted Plaintiff's complaints of paresthesia and decreased sensation in his right arm but found that he had "no edema" in his extremities. (R. at 183.) Dr. Lander's provisional diagnoses were right arm paresthesia, atypical chest pain, radiculopathy,[3] and bipolar disorder. (*Id.*) She described him as "a well developed, well nourished, well hydrated patient who [was] awake, alert, and in no acute distress." (R. at 187.) She admitted him to the hospital for two days to administer more diagnostic studies. (R. at 184.)

X-rays of Plaintiff's cervical spine and right shoulder taken on June 22, 2009 revealed "no evidence of acute fracture or subluxation" but did show "multilevel cervical spondylosis."[4] (R. at 185.) There also was disc space narrowing and ventral osteophyte formation at C5-C6 and C6-C7, uncovertebral hypertrophy at C6-C7 with narrowing of the bony neural foramina at C6-C7 bilaterally, and minor degenerative changes in the acromioclavicular joint. (R. at 230–31.) A resting electrocardiogram (EKG) on that day revealed "ST-T wave changes." (R. at 185.) Dr. Lander's "discharge diagnoses" were multi-level neuroforaminal stenosis, atypical chest pain, hypertension, and depression. (R. at 184.)

A Magnetic Resonance Imaging ("MRI") test taken the next day revealed "cervical spondylosis and multiple levels of neuroforaminal stenosis and vertebral spinal cord abutment." (R. at 185, 228.) It further revealed mild facet arthropathy at C2-C3; left paracentral disc osteophyte

---

[3] Radiculopathy is a "[d]isorder of the spinal nerve roots." *Stedman's Medical Dictionary* 1622 (28th ed. Lippincott Williams & Wilkins, 2006).

[4] Cervical spondylosis is a "degenerative disease of the vertebrae of the neck affecting the joints . . . and discs between the vertebrae and the surrounding ligaments and connective tissue" and its signs and symptoms include: "[g]radually increasing neck pain; impaired range of motion; stiffness in the neck; headache; loss of balance; [and] loss of sensation in the shoulders or arms." *Attorneys' Dictionary of Medicine and Word Finder* C-176 (LexisNexis, 2011).

and severe left and mild right neural foraminal stenosis at C3-C4; mild posterior disc osteophyte complex and mild left neural foraminal stenosis at C4-C5; mild posterior disc osteophyte complex resulting in bilateral severe neural foraminal stenosis at C5-C6; and posterior disc bulge, bilateral uncovertebral hypertrophy, and neural foraminal stenosis at C6-C7. (R. at 228.)

On September 1, 2009, Leela Reddy, M.D., a state agency medical consultant ("SAMC"), reviewed Plaintiff's treatment records and completed a Psychiatric Review Technique Form ("PRTF"). (R. at 239.) Dr. Reddy determined that Plaintiff had no restrictions in his activities of daily living, mild restrictions in social functioning and in maintaining concentration, persistence, or pace, and had experienced no episodes of decompensation. (R. at 239, 249.) She pointed to his ability "to care for his personal needs such as bathing [and] grooming . . . independently." (R. at 251.) She noted his statements that he was "able to maintain his residence by taking out the trash" but "ha[d] difficulty with . . . cleaning activities such as mopping or vacuuming" because of his pinched nerve. (*Id.*) She noted that during a physical examination, he "ambulate[d] without assistance and ha[d] no difficulty rising from furniture or participating in testing." (*Id.*)

On December 29, 2009, Plaintiff presented to Parkland Health and Hospital System (Parkland) complaining of neck pain. (R. at 304.) He told Troy H. Caron, D.O., an orthopedic surgeon, that his neck pain began when "he tripped over a rock and fell down" in August 2009. (*Id.*) His pain had gradually progressed into "a constant, strong, pulsing tightness that radiate[d] from his occiput down to his intrascapular area." (*Id.*) It "continue[d] over to his right scapula and into his right shoulder, continuing posteriorly down his right upper extremity to all of his fingers with numbness and tingling." (*Id.*) Plaintiff rated his pain at 8 on a 10-point scale and complained that it "cause[d] him headaches from time to time." (*Id.*)

-4-

Dr. Caron found that Plaintiff "had [a] normal gait pattern" and "negative Romberg," and his "sensation was grossly intact except for his right C5, C6, and C7 dermatomes." (*Id.*) Plaintiff also "had a negative straight leg raise bilaterally" and negative "Spurling's bilaterally." (*Id.*) He complained of "tenderness upon palpation along the right side of his cervical spine and primarily around his cervical notch" but he had "no tenderness over the lumbar spine" and had "a full range of motion of both [his] cervical and lumbar spines." (*Id.*) His "cranial nerves" were also "intact." (*Id.*) Dr. Caron's diagnosis was "[n]eck pain and right upper extremity pain related to cervical degenerative disc disease, C5 through C7 with broad-based disc protrusion at C3 through C7, with evidence of neural foraminal stenosis at each level." (*Id.*) Dr. Caron recommended that Plaintiff undergo conservative therapy "prior [to] any surgical consideration" and referred him to physical therapy and to Parkland's pain management clinic. (*Id.*) He did "not feel [Plaintiff] qualif[ied] for disability at [that] point in time," but he believed Plaintiff "would benefit from work restrictions of no overhead reaching" and a lifting limitation of no more than 30 pounds. (*Id.*)

Plaintiff returned to Parkland on April 5, 2010, complaining of chronic neck pain. (R. at 296.) He told Prabahav Koti Hanumath Tella, M.D., the examining physician, that his pain was "getting worse." (*Id.*) He "continue[d] to take his analgesics as prescribed" but had "constant pain in the neck that [was] achy and sharp" and "radiate[d] down the right, upper extremity leading to some numbness and tingling, as well as occasional weakness with dropping of objects." (R. at 296–97.) Dr. Tella's diagnosis was "chronic neck pain secondary to degenerative disk disease and facet arthropathy" with "a predominant radicular component to his right upper extremity." (R. at 297.) He found a positive "Spurling's test on the right" but "no gross loss of motor or sensory function in [Plaintiff's] bilateral upper extremities." (*Id.*) He continued Plaintiff's current medications,

scheduled "a cervical epidural steroid injection," and informed him about "the need for physical therapy for function, rehabilitation, and strengthening." (*Id.*)

On May 17, 2010, Plaintiff returned to Parkland complaining of neck and shoulder pain that he rated at 10 on a 10-point scale. (R. at 353–54.) He told the examining physician that his pain medication and "laying flat help[ed] relief [sic] the pain." (R. at 354.) He returned on June 28, 2010, still rating his neck and shoulder pain at 10. (R. at 351–52.) This time, he told the examining physician that he no longer obtained relief from his pain medications. (R. at 352.)

On July 9, 2010, Plaintiff saw Dr. Tella for a follow-up with his neck pain. (R. at 394–96.) He told Dr. Tella that a steroid injection two months earlier provided him "maybe a week of relief" from his pain. (R. at 395.) After that, he was "back to the same level of pain and same radiation of pain as before the injection." (*Id.*) Additionally, he was "unable to turn his head completely because of the pain and stiffness in his neck" and had constant pain in his right shoulder and arm, right fingers, and low back. (*Id.*) Plaintiff rated his pain at 10. (*Id.*) He "seem[ed] anxious and fidgety" during the physical examination. (*Id.*) Dr. Tella found that he "had a positive Spurling test causing increased pain in his right arm" and was "tender to palpation along the spinous processes of the cervical spine and paraspinal muscles and facet joints in his upper neck." (*Id.*) He had "pain with flexion, extension, and rotation, more so with rotation to the right than the left;" had "5/5 strength, C4-T1, [in his] upper extremities bilaterally with manual muscle testing;" and had a "good range of motion of his shoulders bilaterally." (*Id.*) He also complained of "decreased sensation in his right arm and hand compared to his left" and experienced pain in his low back with flexion and extension. (*Id.*) Dr. Tella diagnosed him with "cervicalgia, cervical radiculopathy, myofascial pain, and low back

pain." (R. at 396.) He prescribed him pain medication and referred him to "Orthopedic Surgery since he ha[d] failed conservative injections for his pain." (*Id.*)

On August 5, 2010, Plaintiff presented to Parkland to undergo X-rays of his cervical spine. (R. at 534.) The impressions revealed anterior spurring at C3-C4, C4-C5, C5-C6, and C6-C7; moderate disc space narrowing at C5-C6; mild narrowing at the other cervical levels; and "mild uncovertebral joint hypertrophy bilaterally at C4-C5 and C5-C6." (*Id.*) The final impression was "[m]oderate degenerative change of the cervical spine." (*Id.*)

On February 23, 2011, Plaintiff underwent an electromyogram ("EMG") and a nerve conduction study of his right arm. (R. at 451–55.) The EMG revealed "electrophysiologic evidence of a right C6-C7 radiculopathy" but "no evidence of denervation" in his right arm. (R. at 455.) During a physical examination, Plaintiff exhibited "good strength." (R. at 453.) The final diagnoses were neck and right arm pain, cervicalgia, and pain in limb. (R. at 455.)

On March 10, 2011, Kevin Gill, M.D., a Parkland physician, examined Plaintiff. (R. at 475.) Dr. Gill found that Plaintiff's "sensation [was] intact to light touch from C4 to T1" in his left arm and his right arm showed "decreased sensation in C7 and a little bit in C8 as well." (*Id.*) Dr. Gill found that he had 5/5 strength in grip, finger abduction, wrist extension, flexion of his biceps and triceps, and shoulder abduction. (*Id.*) He opined that X-rays of Plaintiff's cervical spine showed "degenerative changes consisting of bone spur formation anteriorly throughout his C-spine" and an MRI revealed "disk bulging, especially at the level of C3-C4," "some neural foraminal stenosis on the left side," and "neural foraminal stenosis on the right side at C4-C5 and C5-C6." (*Id.*) "[H]is canal appear[ed] to be adequate." (*Id.*) Dr. Gill noted that Plaintiff was "very eager to proceed with surgical intervention for [his] problem." (*Id.*) "Given [Plaintiff's] multilevel degeneration," Dr. Gill was

-7-

"leaning toward performing a C3-C7 laminoplasty with foraminotomies at the levels of stenosis, specifically C6 and C5." (R. at 476.) An alternative procedure would be "a multilevel anterior cervical diskectomy and fusion," but Dr. Gill opined that due to Plaintiff's "fairly diffuse disease," that procedure "may require more than 2 levels to address all of his symptoms." (*Id.*) Dr. Gill "schedule[d] him for surgery" in early April 2011. (*Id.*)

On April 1, 2011, Plaintiff was admitted to Parkland for "multilevel right-sided posterior foraminotomies " at C4-C5, C5-C6, and C6-C7. (R. at 341–44.) Michael J. Bolesta, M.D., the operating surgeon, noted that surgery had been necessary because Plaintiff "ha[d] failed conservative management." (R. at 343.) However, the surgery had to be aborted because Plaintiff developed pulmonary edema after the anesthesiologist experienced "great difficulty in intubating and ventilating him." (R. at 341.) He remained in the hospital for five days due to complications. (R. at 342.) An electrocardiography (ECG) taken that day was "abnormal," revealing "increased R/S ratio in lead V1, right ventricular hypertrophy, or posterior infarct." (R. at 340.)

X-rays of Plaintiff's cervical spine taken on April 28, 2011, "revealed multilevel degenerative changes of the cervical spine" and "anterior osteophytes at C3-C4, C4-C5, C5-C6, and C6-C7;" "mild displaced narrowing at all levels, most prominent at C5-C6 and C6-C7;" and "bilateral uncovertebral joint hypertrophy . . . at C4-C5 and C5-C6." (R. at 531.) On May 26, 2011, Plaintiff returned to Parkland to follow-up with his pre-surgery complications. (R. at 347, 503, 523.) He still experienced neck pain that he rated at 10 in a 10-point scale. (R. at 503.)

3.    Hearing Testimony

On May 3, 2010, Plaintiff and a vocational expert testified at the hearing before the ALJ. (R. at 25–47). Plaintiff was represented by an attorney. (R. at 25.)

-8-

a.      *Plaintiff's testimony*

Plaintiff testified that he was 50 years old. (R. at 28.) He last worked at the Westin Hotel doing "prep work" in the kitchen. (*Id.*) He "[p]repped up the meals and took the meals up to the . . . dining area which [was] the ballroom." (R. at 29.) He worked "[a]longside the chef" but did not do any cooking. (*Id.*) He "helped fix the plates, . . . take the carts up, . . . wash[] dishes[,] and . . . help[ed] [the] the chef out." (*Id.*) He worked there from the end of 2008 until August 2009. (*Id.*)

Plaintiff went to Baylor in June 2009 because he "was having a problem with [his] chest[,] an irregular heartbeat." (R. at 29–30.) He also felt "a pain on the side of [his] neck." (R. at 30.) At Baylor, "they sent [him] to . . . Parkland" because he did not have insurance.  (*Id.*) The pain in his neck and right arm felt "like [a] stabbing pain," starting from the side of his neck, mostly on the right side, and radiated down his right shoulder all the way down to the back of his right hand. (*Id.*) His right hand also went "numb from time to time." (*Id.*) He was scheduled for an MRI of his lower back because he had pain there as well. (*Id.*) His knee also "[gave] out from time to time." (*Id.*) He "had it done years ago but . . . never did follow-up on it." (*Id.*)

Although Plaintiff experienced pain in his left arm "from time to time," his pain was primarily in his right arm. (R. at 30–31.) It was "constant." (R. at 31.) On the day of the hearing, he did not take his pain medication because he knew it would make him drowsy. (*Id.*) He rode the bus to the hearing, and he tried to "get as much exercise as possible." (*Id.*)

On examination by counsel, Plaintiff testified that he could not remember the name of his pain medication because he was "under a lot of stress." (*Id.*) He was "seeing a doctor at the orthopedic clinic" and at "the pain clinic." (R. at 31–32.) He had recently begun receiving physical therapy, which "last[ed] . . . for two days," but he could not do all of the exercises. (R. at 32.) The

exercise that caused him the most difficulty was "lifting . . . on [his] right side." (*Id.*) They also gave him "a stretch band" that he "put under his feet" and pulled with his hands, but that exercise caused him pain in his neck, right shoulder, and right hand. (R. at 32–33.)

Plaintiff was right-handed. (R. at 33.) He could sign his name using his right hand but he could not write a letter because his hand "would cramp up." (*Id.*) The pain started in his neck, radiated down to his right shoulder and arm, and caused his right hand to cramp up. (*Id.*)

In response to a question by the ALJ, Plaintiff testified that his entire right hand and the back side of his right arm hurt. (R. at 33–34.) His right hand got "real numb." (R. at 34.) This happened "[m]aybe two or three times a day" and lasted for "about 35 or 40 minutes," until his pain medication took effect. (*Id.*) He could not use his right arm or hand at all when they hurt and felt numb. (R. at 35.) Certain movements, such as lifting a bag off the floor, triggered his pain and numbness. (*Id.*) This had been occurring since the end of 2009. (R. at 36.) He took his pain medication and lay down to alleviate his pain. (*Id.*)

In response to counsel's question, Plaintiff testified that he lived in an apartment with his sister. (R. at 37.) She worked at Baylor hospital's billing department, usually from 8 a.m. to 4:30 p.m., but sometimes she worked as late as 6 or 6:30 p.m. (*Id.*) While his sister was at work, he watched television, walked to the gym, and walked for about 35 to 40 minutes. (*Id.*) He usually walked to the gym on Mondays and Fridays. (R. at 38.) After walking around the gym for 35 to 40 minutes, he "ha[d] to sit down" before walking back home. (*Id.*)

Plaintiff could not lift his right arm overhead or even up to shoulder level. (*Id.*) When he needed to do things around the house, he used his left hand as much as possible. (*Id.*) He could put

the dishes in the dishwasher, vacuum, and make his bed "from time to time" with his left hand. (R. at 38–39.)

Plaintiff enjoyed going to the recreation center and walking around "as much as possible until the pain start[ed]." (R. at 39.) He also "might walk over to a friend[s] [house]," sit on their porch for a minute or two, and walk back home. (*Id.*) There was "really nothing . . . for [him] to do" at home, and he "g[ot] tired of being at home, tired of laying down," so he would "try to get up and walk as much as possible until . . . the pain start[ed]." (*Id.*) He was on his feet "[m]aybe 10 or 15 minutes at a time" when he was at home and "might walk out and look over the balcony." (*Id.*) He was on his feet for a total of two or three hours a day. (*Id.*)

Plaintiff's sister did the grocery shopping; she brought the groceries from the car "to the top of the stairs and [he] would take them in[to] the house." (R. at 40.) He only helped her with the lightest bags and carried two or three at a time. (*Id.*)

In response to a question by the ALJ, Plaintiff testified that he was convicted of forgery, a felony, and was incarcerated in a state jail for about a year between 2002 and 2003. (R. at 40–41.) He left his job at the Westin Hotel because he "started having these pains." (R. at 41.) He did not quit or get fired, he "was let go." (*Id.*) He "was going to quit anyway, but [he] was let go" because he "was accused of drinking on the job," but it was not true. (*Id.*)

> b.  *Vocational Expert Testimony*

A vocational expert (VE) also testified at the hearing. (R. at 41–46.) She testified that Plaintiff's past relevant work was his job as a kitchen helper (medium, unskilled, SVP-2). (R. at 41.) The ALJ asked the VE to opine whether a hypothetical person with Plaintiff's age, education, and job background could perform his past relevant work with the following limitations: lift and carry 20

pounds occasionally and 10 pounds frequently; push and pull 20 pounds occasionally and 10 pounds frequently; stand, walk, and sit for six of eight hours; occasionally climb ramps and stairs; never climb ladders, ropes, or scaffolds; never balance or crawl; frequently stoop, crouch, and kneel; frequently reach with the right-upper extremity, but only occasionally reach overhead, and no reaching limits on the left-upper extremity; frequently handle, finger, and feel on the right; never work in proximity to hazards, including driving; have occasional contact with co-workers, supervisors, and the public; and understand, remember, and carry-out only one or two-step instructions. (R. at 42–43.) The VE testified that the hypothetical person could not perform Plaintiff's past relevant work. (R. at 43.) She testified that the hypothetical person could perform other light and unskilled jobs including a marker or marking clerk (light, SVP-2), with 2,500 jobs in Texas and 50,000 jobs in the national economy; photocopy machine operator (light, SVP-2), with 3,290 jobs in Texas and 222,000 jobs in the national economy; and garment sorter (light, SVP-2), with 2,000 jobs in Texas and 61,000 jobs in the national economy. (R. at 43–44.) She testified that the "acceptable" "tolerance" for the hypothetical person to "go off-task" was "one to five minutes per hour." (R. at 44.) The "tolerance for absenteeism" was one to two days of work a month; missing three days "would negatively affect job retention." (*Id.*)

After counsel modified the hypothetical to limit "reaching in all directions" to only "occasionally" instead of frequently, the VE testified that the additional limitation "would eliminate not only [those] three [jobs], but the remaining 900 plus occupations" in the category. (R. at 44–45.) In response to a question by the ALJ, the VE stated that her testimony did not conflict with the Dictionary of Occupational Titles ("DOT"). (R. at 45–46.) She also testified that the DOT did not "differentiate in terms of reaching" between bilateral or a single-arm impairment. (R. at 46.)

C.    *ALJ's Findings*

The ALJ issued her decision denying benefits on August 19, 2010. (R. at 11–19.) At step one, she found that Plaintiff had not engaged in substantial gainful activity since his alleged onset date of May 29, 2009.[5] (R. at 13.) At step two, she found that Plaintiff had two severe impairments: obesity and degenerative disc disease of the cervical spine. (*Id.*) Despite those impairments, at step three, she found that Plaintiff had no impairment or combination of impairments that satisfied the criteria of any impairment listed in the social security regulations. (R. at 14.) Next, the ALJ determined that Plaintiff had the following RFC: lift and carry 20 pounds occasionally and 10 pounds frequently; push and pull 20 pounds occasionally and 10 pounds frequently; stand, walk, and sit for six hours of an eight-hour workday; frequently stop, crouch, and kneel; occasionally climb stairs and ramps; never climb ropes, ladders, or scaffolds; never balance or crawl; never work in proximity to hazards, including driving; frequently reach with the right upper extremity, but only occasionally reach overhead; frequently handle, finger, and feel with the right upper extremity; no limitations on the use of the left upper extremity; occasional contact with co-workers, supervisors, and the public; and understand, remember, and carry out only one to two step instructions. (R. at 15.)

At step four, based on the VE's testimony, the ALJ found that Plaintiff could not perform his past relevant work. (R. at 17.) At step five, with the VE's testimony, the ALJ determined that considering Plaintiff's age, education, work experience, and RFC, he could perform other jobs existing in significant numbers in the national economy including marker or marking clerk, with 2,500 positions in Texas and 50,000 positions in the national economy, photocopy machine operator,

---

[5] Plaintiff's alleged onset date is April 1, 2009, and the date of his application for supplemental security income is May 29, 2009. (*See* R. at 118).

with 3,290 positions in Texas and 222,000 positions in the national economy, and garment sorter, with 2,000 positions in Texas and 61,000 positions in the national economy. (R. at 18.) Accordingly, the ALJ determined that Plaintiff was not disabled at any time between his alleged onset date and the date of the ALJ's decision. (R. at 19.)

## II.

## ANALYSIS

A.    *Legal Standards*

1.    <u>Standard of Review</u>

Judicial review of the Commissioner's denial of benefits is limited to whether the Commissioner's position is supported by substantial evidence and whether the Commissioner applied proper legal standards in evaluating the evidence. *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994); 42 U.S.C. §§ 405(g), 1383(C)(3). Substantial evidence is defined as more than a scintilla, less than a preponderance, and as being such relevant and sufficient evidence as a reasonable mind might accept as adequate to support a conclusion. *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995). In applying the substantial evidence standard, the reviewing court does not reweigh the evidence, retry the issues, or substitute its own judgment, but rather, scrutinizes the record to determine whether substantial evidence supports the Commissioner's decision. *Greenspan*, 38 F.3d at 236. A finding of no substantial evidence is appropriate only if there is a conspicuous absence of credible evidentiary choices or no contrary medical findings to support the Commissioner's decision. *Johnson v. Bowen*, 864 F.2d 340, 343-44 (5th Cir. 1988).

The scope of judicial review of a decision under the supplemental security income program is identical to that of a decision under the social security disability program. *Davis v. Heckler*, 759

F.2d 432, 435 (5th Cir. 1985). Moreover, the relevant law and regulations governing the determination of disability under a claim for disability insurance benefits are identical to those governing the determination under a claim for supplemental security income. *See id.* The Court may rely on decisions in both areas, without distinction, when reviewing an ALJ's decision. *See id.*

2.    Disability Determination

To be entitled to social security benefits, a claimant must prove he or she is disabled as defined by the Social Security Act. *Leggett*, 67 F.3d at 563–64; *Abshire v. Bowen*, 848 F.2d 638, 640 (5th Cir. 1988). The definition of disability under the Social Security Act is "the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *Anthony v. Sullivan*, 954 F.2d 289, 292 (5th Cir. 1992).

The Commissioner utilizes a sequential five-step inquiry to determine whether a claimant is disabled:

1.    An individual who is working and engaging in substantial gainful activity will not be found disabled regardless of medical findings.

2.    An individual who does not have a "severe impairment" will not be found to be disabled.

3.    An individual who "meets or equals a listed impairment in Appendix 1" of the regulations will be considered disabled without consideration of vocational factors.

4.    If an individual is capable of performing the work he has done in the past, a finding of "not disabled" must be made.

5.    If an individual's impairment precludes him from performing his past work,

other factors including age, education, past work experience, and residual functional capacity must be considered to determine if work can be performed.

*Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991) (per curiam) (summarizing 20 C.F.R. § 404.1520(b)-(f) (currently 20 C.F.R. § 404.1520(a)(4)(i)-(v) (2012))). Under the first four steps of the analysis, the burden lies with the claimant to prove disability. *Leggett*, 67 F.3d at 564. The analysis terminates if the Commissioner determines at any point during the first four steps that the claimant is disabled or is not disabled. *Id.* Once the claimant satisfies his or her burden under the first four steps, the burden shifts to the Commissioner at step five to show there is other gainful employment available in the national economy that the claimant is capable of performing. *Greenspan*, 38 F.3d at 236. This burden may be satisfied either by reference to the Medical-Vocational Guidelines of the regulations, by vocational expert testimony, or other similar evidence. *Fraga v. Bowen*, 810 F.2d 1296, 1304 (5th Cir. 1987). A finding that a claimant is not disabled at any point in the five-step review is conclusive and terminates the analysis. *Lovelace v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987).

B.    *Issues for Review*

Plaintiff presents the following issues for review:

(1)    "By the explicit terms of the statute, the ALJ was required to discuss the evidence offered in support of [an individual's] claim for disability and explain why she found [the claimant] not to be disabled at that step." When deciding Grays' claim at Step 3, the ALJ made the conclusory finding that "[n]one of the claimant's impairments, either alone or in combination, is so severe as to meet or medically equal a listed impairment." Can this Court affirm that finding as supported by substantial evidence?

(2)    The Fifth Circuit held in *Ripley v. Chater* that an ALJ cannot derive a residual functional capacity without the support of a medical opinion. The Court reasoned the RFC was not supported by substantial evidence because an ALJ

-16-

cannot determine the effects a claimant's condition has on the ability to work. Because the physical impairments were not reviewed at the initial or reconsideration levels, there was no medical opinion on the effects Grays' cervical disc disease would have on his ability to perform work related functions. Is the ALJ's RFC and corresponding hypothetical question—on which the ALJ relied to find him not disabled—supported by substantial evidence?

(Pl. Br. at 2.)

C.    *Listed Impairment*

Plaintiff first argues that remand is required because the ALJ erred at step three of the sequential evaluation process by making "the conclusory finding" that none of his physical impairments was "so severe" as to meet or medically equal a listed impairment. (Pl. Br. at 13.) He argues that the ALJ's finding is "both legally deficient and not supported by substantial evidence" because she failed to "mention listing 1.04A, set out the criteria of the listing, [and] bridge the evidence in the record to the listing criteria." (*Id.*) He contends that the ALJ's error "prejudiced" his claim because there was evidence in the record "that indicated he had the symptoms to meet his burden of proof" of showing he met the listing. (*Id.* at 17.) The Commissioner responds that the ALJ did not err at step three because she "clearly stated that [she] especially considered the musculoskeletal listing," and "substantial evidence supports [the] ALJ's finding that Plaintiff's impairments did not meet all the criteria for [this] listing[]." (Def. Br. at 6.)

If a claimant is not working and is found to have a severe impairment at step two that meets the duration requirement, the ALJ must determine at step three whether the claimant's impairment meets or medically equals one of the impairments listed in the regulations.[6] *Compton v. Astrue*, No.

---

[6] These impairments are listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1.

3:09-CV-0515B-BH, 2009 WL 4884153, at *6 (N.D. Tex. Dec. 16, 2009) (citing 20 C.F.R. § 404.1520). If the claimant's impairment or combination of impairments meets or medically equals a listed impairment, the disability inquiry ends and the claimant is entitled to benefits. 20 C.F.R. § 404.1520(d) (2012). The claimant has the burden of proving that his impairment or combination of impairments meets or medically equals one of the listings. *Id.*; *Selders v. Sullivan*, 914 F.2d 614, 619 (5th Cir. 1990).

To meet a listed impairment, the claimant's medical findings, *i.e.*, symptoms, signs, and laboratory findings, must match all those corresponding to the listed impairment. 20 C.F.R. §§ 404.1525(d), 404.1528; *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990). "Whether a claimant's impairment meets the requirements of a listed impairment is usually more a question of medical fact than opinion because most of the requirements are objective and simply a matter of documentation, but it is still an issue ultimately reserved to the Commissioner." *Stovall v. Astrue*, No. 4:10-CV-180-A, 2011 WL 2413323, at *7 (N.D. Tex. Apr. 4, 2011), *recommendation adopted*, No. 4:10-CV-180-A, 2011 WL 2413224 (N.D. Tex. June 15, 2011) (citing Social Security Ruling (SSR) 96–5p, 1996 WL 374183, at *3 (S.S.A. July 2, 1996)). To equal a listing, the claimant's unlisted impairment or combination of impairments must be "at least equal in severity and duration to the criteria of any listed impairment." 20 C.F.R. § 404.1526(a). The claimant shows that his unlisted impairment or combination of impairments is medically "equivalent" to a listed impairment by presenting medical findings equal in severity to *all* the criteria for the most analogous listed impairment. *Sullivan*, 493 U.S. at 529–31; *see also* 20 C.F.R. § 404.1526(b)(2).

Here, Plaintiff contends that his degenerative disc disease of the cervical spine was severe enough to meet Listing 1.04A. (Pl. Br. at 14.) He argues that his "injury affecting [his] neck and

arm" resulted in the "functional loss" required by the listing given his "inability to perform fine and gross movements effectively on a sustained basis." (*Id.*)

> Listing 1.04A provides, in relevant part:
>
> 1.04 Disorders of the spine (e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including the cauda equina) or the spinal cord. With:
>
>> A.    Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine).

20 C.F.R. Part 404, Subpt. P, App. 1, § 1.04(A) (2012). To demonstrate the required "motor loss" for a musculoskeletal impairment, the claimant must demonstrate either an "inability to ambulate effectively on a sustained basis . . ., or the inability to perform fine and gross movements effectively on a sustained basis." *Id.* § 1.00(B)(2); *Audler v. Astrue*, 501 F.3d 446, 448-49 (5th Cir. 2007).

At step three, in finding that Plaintiff's degenerative disc disease of the cervical spine and obesity, "either alone or in combination," were not "so severe as to meet or medically equal a listed impairment," the ALJ only stated that she "especially … considered" "[t]he listings for musculoskeletal impairments." (R. at 14.) She did not, however, compare Plaintiff's cervical spine disease to a specific listing under § 1.04. (*See id.*) Moreover, apart from this brief reference to Plaintiff's physical impairments, the ALJ's step three narrative discussion focused entirely on Plaintiff's mental impairment—his depression. (*See* R. at 14–15.)

"By the explicit terms of the statute, the ALJ was required to discuss the evidence offered in support of [Plaintiff's] claim for disability and to explain why she found [Plaintiff] not to be disabled

at … step [three]." *Audler*, 501 F.3d at 448 (citing 42 U.S.C. § 405(b)(1)). Although the ALJ may reject a treating physician's opinion when the physician lacks credibility, the ALJ must find "with support in the record, that the physician is not credible and is 'leaning over backwards to support the application for disability benefits.'" *Scott v. Heckler*, 770 F.2d 482, 485 (5th Cir. 1985). The ALJ committed legal error at step three by failing to discuss any of Plaintiff's medical evidence, including the findings and opinions of his treating physicians, as the evidence related to the issue of whether Plaintiff's degenerative disc disease met the severity criteria of Listing 1.04A. *See Audler*, 501 F.3d at 448 (finding legal error where "the ALJ offered nothing to support her conclusion at … step [three]," and as a result, the Court "simply [could not] tell whether her decision [was] based on substantial evidence or not"); *see also Hamilton v. Astrue*, No. CIV. A. 10-363-SCR, 2011 WL 5835090, at *4–5 (M.D. La. Nov. 21, 2011) (holding that the ALJ committed legal error at step three because he "failed to address Listing 1.04A" and relied solely on a non-examining consultant's opinion to find that the claimant's degenerative disc disease did not meet this listing, but the consultant's opinion was based on an incomplete record).

Nevertheless, although the ALJ committed legal error at step three, the Court must still consider whether the error was harmless. *See Audler*, 501 F.3d at 448 ("Having determined that the ALJ erred in failing to state any reason for her adverse determination at step 3, we must still determine whether this error was harmless.") In the Fifth Circuit, harmless error exists when it is inconceivable that a different administrative conclusion would have been reached absent the error. *Bornette v. Barnhart*, 466 F. Supp. 2d 811, 816 (E.D. Tex. 2006) (citing *Frank v. Barnhart*, 326 F.3d 618, 622 (5th Cir. 2003)).

Plaintiff essentially argues that the ALJ's error was not harmless because the ALJ ignored medical evidence showing that his degenerative disc disease of the cervical spine[7] met the severity criteria of Listing 1.04A. (Pl. Br. at 14–15.) He contends that the "nerve root injury" "affecting [his] neck and arm" resulted in his "inability to perform fine and gross movements effectively on a sustained basis." (*See id.*) The Commissioner responds that any step three error was harmless because elsewhere in her opinion the "ALJ cited medical evidence demonstrating that Plaintiff did not meet Listing 1.04A." (Def. Br. at 8.) The Commissioner contends that reversal is not warranted because substantial evidence supports the ALJ's step three determination. (*Id.* at 6–8.)

Plaintiff points to physical examinations showing the various symptoms he experienced as a result of his degenerative disc disease, including "tenderness on palpitation, positive Spurling's test on the right, decreased range of motion in the [right] arm, … and decreased sensation in the right arm and hand." (R. at 15, 382, 475.) Notably, the only reference in the record specifically relating to any "motor loss" in his right arm is Dr. Tella's April 5, 2010 observation that despite Plaintiff's alleged pain, numbness, and tingling in his right arm, he had no gross loss of motor or sensory function in his bilateral upper extremities. (*See* R. at 297; *see also* 20 C.F.R. Part 404, Subpt. P, App. 1, § 1.00(B)(2).

Moreover, on July 9, 2010, Dr. Tella found that Plaintiff had 5/5 strength in muscle testing in his upper extremities and his shoulders had a good range of motion. (R. at 395.) A physical examination conducted on February 23, 2011 showed that Plaintiff had good strength and an EMG

---

[7] Plaintiff also points to his osteoarthritis, but the ALJ did not find osteoarthritis to be one of his severe impairments at step two, and she was therefore not required to analyze its level of severity at step three. (*See* R. at 13).

revealed no evidence of "denervation" in his right arm. (R. at 455.) By May 10, 2011, Plaintiff still complained of decreased sensation at C7 and C8, but had 5/5 strength in grip, finger abduction, wrist extension, flexion of his biceps and triceps, and shoulder abduction. (R. at 475.) Accordingly, even if Plaintiff's cervical disc disease was severe enough to "compromise a nerve root" and cause pain and numbness in his right arm and hand, his medical evidence falls short of meeting his burden to show that his impairment prevented him from performing "fine and gross movements" with his right arm and hand "effectively, on a sustained basis." *See* 20 C.F.R. Part 404, Subpt. P, App. 1, § 1.00(B)(2).

Even if the ALJ had discussed Plaintiff's medical evidence relating to his cervical disc disease at step three, it is inconceivable that she would have found that this impairment was severe enough to meet Listing 1.04A. The ALJ's error was therefore harmless and does not warrant reversal. *See Stovall*, 2011 WL 2413323, at *8–9 (holding that the ALJ's step three error in failing to explain why the claimant's impairments did not meet or equal a listed impairment was harmless because the claimant did not "present[] any specific evidence . . . suggesting that any of his impairments met or equaled a listed impairment" and "the record [did] not indicate a likelihood or even reasonable possibility that medical equivalence would be found based on [his] impairments"); *Morris v. Astrue*, No. 4:07-CV-547-A, 2008 WL 4791663, at *2 (N.D. Tex. Oct. 24, 2008) (holding that the ALJ's step three error was harmless because the claimant did not present sufficient medical evidence showing "that she met or equaled a Listing requirement for § 1.04A, and she [could not] demonstrate that her substantial rights [had] been affected"); *compare to Audler*, 501 F.3d at 449 (step three error was not harmless because the claimant introduced medical evidence with which she "appear[ed] to have met her burden of demonstrating that she [met] the Listing requirements for

§ 1.04A, and therefore her substantial rights were affected by the ALJ's failure to set out the bases for her decision at step three").

D.     *RFC Determination*

Plaintiff also argues that remand is required because the ALJ's RFC determination is not supported by substantial evidence, given that no treating or consulting physician rendered an opinion about the effect that his degenerative disc disease had on his ability to perform physical work-related functions. (Pl. Br. at 17–20.) He essentially argues, in the alternative, that the ALJ failed to fully and fairly develop the record by failing to obtain medical opinions regarding his exertional limitations. (*Id.* at 20–21.) He contends that he suffered prejudice as a result of the ALJ's improper use of her lay opinion in determining his exertional limitations because it led to an unsupported RFC and a defective hypothetical to the VE. (*Id.* at 20–22.)

Residual functional capacity, or RFC, is defined as the most that a person can still do despite recognized limitations. 20 C.F.R. § 404.1545(a)(1) (2003). It "is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis." Social Security Ruling (SSR) 96-8p, 1996 WL 374184, at *1 (S.S.A. July 2, 1996). An individual's RFC should be based on all of the relevant evidence in the case record, including opinions submitted by treating physicians or other acceptable medical sources. 20 C.F.R. § 404.1545(a)(3) (2012); SSR 96-8p, 1996 WL 374184, at *1.

The ALJ "is responsible for assessing the medical evidence and determining the claimant's residual functional capacity." *Perez v. Heckler*, 777 F.2d 298, 302 (5th Cir. 1985). The ALJ may find that a claimant has no limitation or restriction as to a functional capacity when there is no allegation of a physical or mental limitation or restriction regarding that capacity and no information in the

record indicates that such a limitation or restriction exists. *See* SSR 96-8p, 1996 WL 374184, at *1. The ALJ's RFC decision can be supported by substantial evidence even if she does not specifically discuss all the evidence that supports her decision or all the evidence that she rejected. *Falco v. Shalala*, 27 F.3d 160, 164 (5th Cir. 1994). A reviewing court must defer to the ALJ's decision when substantial evidence supports it, even if the court would reach a different conclusion based on the evidence in the record. *Leggett*, 67 F.3d at 564.

Nevertheless, the substantial evidence review is not an uncritical "rubber stamp" and requires "more than a search for evidence supporting the [Commissioner's] findings." *Martin v. Heckler*, 748 F.2d 1027, 1031 (5th Cir. 1984) (citations omitted). The Court "must scrutinize the record and take into account whatever fairly detracts from the substantiality of the evidence supporting the" ALJ's decision. *Id.* Courts may not reweigh the evidence or substitute their judgment for that of the Secretary, however, and a "no substantial evidence" finding is appropriate only if there is a "conspicuous absence of credible choices" or "no contrary medical evidence." *See Johnson*, 864 F.2d at 343 (citations omitted).

Here, after carefully reviewing the evidence and making a credibility finding regarding Plaintiff's alleged symptoms and limitations, the ALJ determined that Plaintiff had the following RFC: lift and carry 20 pounds occasionally and 10 pounds frequently; push and pull 20 pounds occasionally and 10 pounds frequently; stand, walk, and sit for six hours of an eight-hour workday; frequently stop, crouch or kneel; occasionally climb stairs and ramps; never climb ropes, ladders, or scaffolds; never balance or crawl; never work in proximity to hazards including driving; frequently reach with the right upper extremity, but only occasionally reach overhead; frequently handle, finger, and feel with the right upper extremity; no limitations on the use of the upper extremity; have

occasional contact with coworkers, supervisors, and the public; and understand, remember, and carry out only one to two step instructions. (R. at 15.)[8]

In determining Plaintiff's physical RFC, the ALJ first acknowledged that Plaintiff's "physical condition ha[d] not been evaluated by Disability Determination Service medical consultants." (R. at 15.) She noted Plaintiff's "history of degenerative disc disease of the cervical spine that [was] supported by [MRI impressions]." (R. at 16.) She pointed to the June 2009 MRI of Plaintiff's cervical spine showing several abnormalities, including "cervical spondylosis with multiple levels of neural foraminal stenosis." (R. at 16, 228.) She noted that a subsequent MRI taken in December 2009 revealed disc protrusion at various levels of Plaintiff's cervical spine as well as neural foraminal stenosis at some levels. (R. at 16, 305.) The ALJ also acknowledged Plaintiff's complaints of weakness in his right arm during a physical examination in June 2009, but noted that subsequent examinations showed he had an "intact" range of motion in his "upper extremities" and "5/5 strength" "in all extremities." (R. at 16, 395, 475.)

The ALJ considered it important that in April 2010, Plaintiff "had a positive Spurling's test on the right but there was no gross loss of motor or sensory function in [his] bilateral extremities." (R. at 16, 297.) She concluded that despite Plaintiff's statements about the intensity, persistence, and limiting effects of his pain, his pain did "not constitute a disabling condition because it [was] not constant, remitting, and wholly unresponsive to therapeutic treatment." (R. at 16–17.) In reaching this finding, she explained that Plaintiff's treatment had "been essentially routine and/or conservative

_____

[8] At step five, based on the testimony of the VE, the ALJ concluded that Plaintiff had the physical RFC to perform light and unskilled work existing in significant numbers in the national economy. (R. at 18.)

in nature, which [did] not indicate [Plaintiff's] total disability." (R. at 17.) She found that Plaintiff's allegations that he experienced radiating pain in his right arm and that he lost all use of his right arm were not credible and were not fully consistent with physical examinations. (*Id.*) Lastly, she found it important that no treating or examining physician ever opined or indicated that Plaintiff was disabled or had "greater [physical] limitations" than those she included in her RFC assessment. (*Id.*)

Based on the evidence she cited, the ALJ found that Plaintiff could frequently reach, "except only occasionally [reach] overhead," and frequently handle, finger, and feel with his right upper extremity. (R. at 15.)   Notably, while several treating and examining physicians made findings about the manifestations of Plaintiff's degenerative disc disease, no physician opined about the effects that this impairment had on his ability to reach, handle, finger, and feel with his right upper extremity. Although the absence of a medical source statement describing the types of work that a claimant is still capable of performing does not make the record incomplete, "evidence describing the claimant's medical conditions is insufficient to support an RFC determination." *Moreno v. Astrue*, 5:09-CV-123-BG, 2010 WL 3025525, at *3 (N.D. Tex. June 30, 2010), *recommendation adopted*, 5:09-CV-123-C, 2010 WL 3025519 (N.D. Tex. Aug. 3, 2010) (citing *Ripley v. Chater*, 67 F.3d 552, 557 (5th Cir. 1995)); *see also Williams v. Astrue*, 355 F. App'x 828, 832 n.6 (5th Cir. 2009) ("In *Ripley*, we held that an ALJ may not—without opinions from medical experts—derive the applicant's residual functional capacity based solely on the evidence of his or her claimed medical conditions. Thus, an ALJ may not rely on his own unsupported opinion as to the limitations presented by the applicant's medical conditions."). Accordingly, "the ALJ impermissibly relied on [her] own medical opinions" to determine the effects that Plaintiff's impairment had on his ability to work. *See Williams*, 355 F. App'x at 832; *see also Moreno*, 2010 WL 3025525, at *3.

Nevertheless, because "[p]rocedural perfection in administrative proceedings is not required" and a court "will not vacate a judgment unless the substantial rights of a party are affected," Plaintiff must show that he was prejudiced by the ALJ's failure to obtain medical opinion evidence in assessing his RFC. *Mays v. Bowen*, 837 F.2d 1362, 1364 (5th Cir. 1988) (per curiam). "Procedural errors in the disability determination process are considered prejudicial when they cast doubt onto the existence of substantial evidence in support of the ALJ's decision." *McNair v. Comm'r of Soc. Sec. Admin.*, 537 F. Supp. 2d 823, 837 (N.D. Tex. 2008) (citing *Morris v. Bowen*, 864 F.2d 333, 335 (5th Cir. 1988)). To establish prejudice, Plaintiff must show that the ALJ's failure to consult medical opinion evidence in assessing his manipulative limitations casts doubt onto the existence of substantial evidence supporting her decision. *See Bornette*, 466 F. Supp. 2d at 816; *see also Newton v. Apfel*, 209 F.3d 448, 458 (5th Cir. 2000).

In December 2009, Dr. Caron opined that Plaintiff could benefit from work limitations of "no overhead reaching," but he made no opinion regarding Plaintiff's ability to handle, finger, and feel with his right hand. (R. at 305.) While Dr. Caron opined that Plaintiff did not qualify for disability in December 2009[9] and suggested that he treat his degenerative disc disease with conservative treatment, by March 10, 2011, Dr. Gill, Plaintiff's treating physician at Parkland, determined that surgery was necessary, specifically laminoplasty and foraminotomies at C5 and C6 where Plaintiff's stenosis was most severe. (R. at 305, 475.)

---

[9] Dr. Caron opinion that Plaintiff would not qualify for disability in December 2009 is not dispositive of this issue because determination of a claimant's disability is not a medical opinion, but rather a legal conclusion that is reserved for the Commissioner. *See* 20 C.F.R. § 404.1527(e); *Frank*, 326 F.3d at 620.

Notably, although Dr. Tella found that Plaintiff had no gross loss of motor or sensory function in his upper extremities in April 2010, he opined that Plaintiff's "chronic neck pain secondary to degenerative disc disease and facet arthropathy" had "a predominant radicular component to his right upper extremity." (R. at 297.) In July 2010, Dr. Tella found that Plaintiff had a "positive Spurling test" that increased his pain in his right arm. (R. at 395.) Even though Plaintiff had 5/5 strength in both arms and a good range of motion in his shoulders, his pain increased when he rotated his right arm. (*Id.*) Plaintiff also had "decreased sensation" in his right arm and hand compared to his left. (*Id.*) Contrary to the ALJ's finding that Plaintiff treated his cervical disc disease conservatively, Plaintiff was scheduled to undergo a surgical procedure, multilevel right-sided foraminotomies at C4-C7, on April 1, 2011 because all conservative treatment had failed to alleviate his symptoms. (R. at 341–44.)

Had the ALJ considered this evidence and obtained a medical source opinion regarding the effects that Plaintiff's degenerative disc disease had on his ability to reach, handle, finger, and feel with his right hand, she might have imposed greater manipulative restrictions in her RFC assessment. If the ALJ had tracked that RFC in her hypothetical to the VE, a different conclusion might have been reached regarding Plaintiff's ability to perform the jobs of marker or marking clerk, photocopy machine operator, and garment sorter. Accordingly, the ALJ's RFC assessment cannot be said to be supported by substantial evidence, and remand is required because the ALJ's failure to consult medical opinion evidence in determining Plaintiff's manipulative limitations prejudiced his claim. *See Ripley*, 67 F.3d 552; *see also Moreno*, 2010 WL 3025525, at *3.

## III.

## CONCLUSION

Plaintiff's motion is **GRANTED in part**, Defendant's motion is **DENIED in part**, and the case is **REMANDED** to the Commissioner for further proceedings consistent with this Memorandum Opinion and Order.

SO ORDERED.

SIGNED: March 19, 2013.

JANE J. BOYLE
UNITED STATES DISTRICT JUDGE